UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

    TRICYCLE ENTERPRISES, INC.         CASE NO. 04-65901

                            Debtor         Chapter 11
--------------------------------------------------------
APPEARANCES:

RICHARD P. RUSWICK, ESQ.
Attorney for John N. Roscoe
401 East State St.
Suite 306
Ithaca, NY 14850

STEWART L. WEISMAN, ESQ.
LAW OFFICE OF STEWART L. WEISMAN
Attorney for Debtor in Possession
Box 598
Shadow Rock Rd.
Manlius, NY 13104-0598

EDWARD Y. CROSSMORE, ESQ.
THE CROSSMORE LAW OFFICE
Attorneys for Linda Sichel Truitt
115 West Green St.
Ithaca, NY 14850

GUY A. VAN BAALEN, ESQ.
Assistant U.S. Trustee
10 Broad St.
Utica, New York 13501


Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge


**MEMORANDUM-DECISION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**


    Under consideration by the Court is a motion filed by John N. Roscoe ("Roscoe") on

2

November 22, 2004, seeking an order reconverting Tricycle Enterprise Inc.'s ("Tricycle" or the "Debtor") chapter 11 case to a chapter 7, or alternatively, appointing a Chapter 11 trustee pursuant to §§ 1112(b) or 1104(a) of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 ("Code"). Linda Sichel Truitt ("Sichel") filed opposition to Roscoe's motion on December 17, 2004. On December 20, 2004, the assistant United States Trustee, Guy A. Van Baalen, Esq., ("U.S. Trustee"), submitted a joinder to Roscoe's motion because of several procedural objections to the Debtor's bankruptcy case, which the Debtor later resolved. On January 25, 2005, the Court appointed the Harris Law Office, PLLC as attorney to the Debtor.[1] The Debtor filed a cross-motion on February 23, 2005, requesting that the Court lift the automatic stay to permit the continuation of Sichel's pending New York State Supreme Court lawsuit against Roscoe, the Debtor and Cayuga Millwork, Inc. ("Cayuga Millwork"). The Debtor also filed a motion on March 16, 2005, seeking an order directing James Salk, Esq. and Roscoe to turn over property of the estate pursuant to Code § 542. Roscoe responded by requesting that the Court deny the Debtor's motions.

    The Court scheduled the motions for a hearing on December 23, 2004, but the hearing was adjourned to January 27, 2005, to March 1, 2005, and then to March 31, 2005, when the Court heard the motions at its regular motion term in Binghamton, New York. The Court granted the Debtor's motion for turnover without prejudice on April 14, 2005. The Court then scheduled Roscoe's motion for reconversion or appointment of a trustee for an evidentiary hearing on July 7, 2005. Upon conclusion of the July 7th evidentiary hearing, the Court reserved decision on the

---

[1] On July 18, 2005, the Law Office of Stewart L. Weisman was substituted for the Harris Law Office, PLLC as the Debtor's counsel pursuant to Local Rule 2092-1(a).

motion. The Court provided the parties an opportunity to file memoranda of law by August 8, 2005. In addition, the Court adjourned the Debtor's cross-motion for automatic stay relief until the Court issued a decision on Roscoe's motion.[2]

## JURISDICTION

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1), (b)(2)(A), and (O).

## FACTS

At the evidentiary hearing, Sichel testified that she and her then husband, Roscoe, used Sichel's savings to found an architectural woodworking company identified as Tricycle. Sichel explained in her testimony that she was the Debtor's sole owner because when Sichel and Roscoe founded the Debtor, Roscoe had just emerged from personal bankruptcy. Sichel testified that she is an architect and she performed estimates for the Debtor (reviewing blueprints and providing lists of the required woodwork) and designed shop drawings. Roscoe testified that he is a master woodworker and he was the general manager for the Debtor when it was operating. Roscoe testified that he and Sichel were married in April of 1995. According to Roscoe, the Debtor was

---

[2] As this Court was about to issue this Memorandum-Decision, Findings of Fact, Conclusions of Law and Order, Roscoe filed a voluntary petition pursuant to chapter 13 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") on January 5, 2006. On March 23, 2006, this Court entered an Order dismissing the case for non-compliance with 11 U.S.C. § 521(a)(1)(B)(iv).

4

founded in 1996. Roscoe testified that he and Sichel separated in August of 1998. As their marriage fell apart, their marital strife caused the Debtor's spiral into bankruptcy. Ultimately, the marriage ended in divorce in May of 2003.

Roscoe testified that in September of 1999, the Debtor appointed three advisors to the company: the corporate attorney, James Salk, Esq. ("Salk"), a mediator, Dr. Ron Leifer ("Leifer"), and Matt McSherry ("McSherry"), who was the Debtor's CPA. Despite the appointment of the advisors, the Debtor continued its downward trend. Roscoe testified that after September of 1999, he and Sichel were rarely able to have a civil conversation, though they continued to operate the Debtor until March of 2001. As much of the Court's evidentiary hearing consisted of Sichel and Roscoe's attempts to portray themselves as victims and to cast the other as the reason for the Debtor's collapse, the Court will only highlight selected parts of the evidentiary hearing to provide a glimpse of how the Debtor was self-destructing.

Roscoe testified that Sichel performed numerous acts that disrupted the company, which included the following: yelling at Roscoe; screaming at employees; throwing things in the corporate offices; attempting to fire employees; taking the Debtor's mail during a period of two weeks; emptying the Debtor's Binghamton Savings Bank account of $26,000; refusing to estimate jobs that were presented to her; and causing employees to quit. These actions, Roscoe alleged, caused the Debtor to enter into contracts below its manufacturing costs and to bounce checks from the Binghamton Savings Bank account.

Leifer, a psychiatrist/psychotherapist/counsel, testified that Roscoe and Sichel had first retained him as a marriage counselor, and he then became an advisor to the Debtor in or around 1999. Leifer testified that he tried to create some cooperation between Roscoe and Sichel to

5

facilitate the Debtor's continuing operation. He explained that he had met with Sichel at least once a week for one to four hours to deal with Sichel's anger and her conflicts with Roscoe. According to Leifer, Sichel objected to the way Roscoe handled the corporate books, she wrote letters to creditors and customers to inform them that she was not going to be responsible for the Debtor's work, she did not complete assignments assigned to her and she appropriated the Debtor's mail and did not return it. Leifer believed that there was a vindictiveness in the divorce that has caused Sichel to continue pursuing a state court lawsuit against Roscoe. Based on Leifer's knowledge, and his thirty years of practice, he believed that Sichel still harbors anger towards Roscoe. However, on cross-examination, Leifer admitted that he had not seen Sichel in five years, that Roscoe continues to pay for his counseling services, and that he entered into a Consent Order in May of 2004 with the New York State Office of Professional Medical Conduct ("OPMC") in which he agreed to have the OPMC monitor his medical practice for three years.

Barry Bustle ("Bustle") testified that he was hired by the Debtor in 1997 or 1998 and that he worked as a foreman. Bustle stated that he is now employed by Cayuga Millwork. Bustle testified that as things became more and more difficult between Roscoe and Sichel, it seemed that he was doing most of the running of the company. Bustle said that in or around 1999, he called the police twice because Sichel had exploded in anger on the company site. The second time, Bustle said, the police had to call for backup. He testified that Sichel screamed at the six police officers and caused physical damage to the premises. He said that they could never get work from Sichel.

In Sichel's testimony, she admitted yelling while on the Debtor's premises, but said that Roscoe had yelled as well. She said that Roscoe was demanding that Sichel work, but not

6

providing her with the resources to do the work. According to Sichel, she was impaired in her work because Roscoe failed to pay the subscription for the McGraw-Hill Construction Dodge marketing service maintained by the Debtor. She said that this service provided announcements on what contractors were going to bid on, and the contractors were the Debtor's primary market. Sichel asserted that the Debtor's creditors were often asked to wait for money, but that Roscoe never had to wait to receive his money from the Debtor. As Sichel was a creditor, she said that having to wait to receive money put extreme hardship on her and her family. She said that during the week of July 7th, 2000, she briefly intercepted the mail going to the Debtor because she had been stonewalled in her attempts to look at the mail at the Debtor's premises. Sichel said that she had unsuccessfully made requests to Roscoe, the bookkeeper, and McSherry for information about what was going on in the company. According to Sichel, looking at the Debtor's mail was the only means at her disposal to gain more information about the Debtor. She testified that she picked up the Debtor's mail at the post office and then placed the mail into the Debtor's mailbox at its premises. She explained that in Salk's presence, she opened up one envelope containing the Debtor's payroll records. According to Sichel, these records revealed to her that Roscoe's wages were higher than the amount Roscoe and she had agreed upon. Sichel said that she asked Salk to hold Roscoe's check, but he refused, whereupon she gave the check to her personal attorney, who then delivered it to Roscoe's attorney. Sichel also said that in or around July of 2000, she emptied the Debtor's account at the Binghamton Savings Bank and then deposited the money into a different account, which McSherry had selected. She said that she transferred the money because Roscoe had agreed to transfer financial control of the Debtor to McSherry, and Roscoe was the sole signatory authority on the Binghamton Savings Bank account, while

McSherry was the sole signatory on the new account.

Sichel admitted that Roscoe had made a request for a corporate board meeting in February of 2002. She did not attend the meeting, she explained, because the meeting's purpose was to borrow money for the Debtor. According to Sichel, borrowing money was not necessary because Roscoe had taken a bonus the previous year that he had not earned. Any money that the Debtor needed, Sichel explained, was in Roscoe's possession. During Roscoe's testimony, he alleged that the purpose of the meeting was to obtain money so that the Debtor could pay the approximately $15,000 workers' compensation premium that was due. Sichel said that this purpose was never made known to her. Roscoe testified that because the Debtor never paid the required premium, the insurance carrier cancelled the Debtor's workers' compensation policy. According to Roscoe, the Debtor stopped operating at that date, which was in March of 2001.

Roscoe testified that on March 14, 2001, he formed an architectural woodworking corporation identified as Cayuga Millwork, Inc., of which he is the sole shareholder and officer. Apparently in 2002, Sichel then commenced an action in the Supreme Court of the State of New York, County of Tompkins, ("State Court Action") against Roscoe, the Debtor and Cayuga Millwork, Inc., requesting the following relief: (1) a judgment determining that the assets of Cayuga Millwork, Inc., tangible and intangible, whether acquired from the Debtor or elsewhere, are constructively the Debtor's assets; (2) a judgment determining that Roscoe violated his fiduciary duties to the Debtor's creditors and shareholders; (3) an interlocutory decree requiring Roscoe to file an accounting of the financial activities of the Debtor for the years 1998, 1999, 2000, and 2001; (4) the appointment of a referee to hold such proceedings as may be necessary to determine exceptions to the items of Roscoe's accounting, and; (5) upon the application to

confirm the report of the referee that the court also determine Roscoe's liability for punitive damages and issue an appropriate judgment against Roscoe on the accounting and for punitive damages. *Aff. of Edward Y. Crossmore, sworn to on Dec. 17, 2004,* ex. A. Sichel apparently commenced the State Court Action as an officer and director of the Debtor. *Id.* Although it is not derivative, Sichel asserts that she is pursuing the action on the Debtor's behalf because the recovery and cause of action belong to the Debtor and not to some "independent and distinct" interest of Sichel. *Mem. on behalf of Linda Sichel in Opposition to Motion by Jack Roscoe*, p.1-2. Sichel claimed in her testimony that the Debtor's major asset is this State Court Action.

Roscoe and Cayuga Millwork, Inc. apparently responded to the complaint by alleging, *inter alia*, the following: (1) Sichel violated her duty of good faith owed to the Debtor; and (2) Roscoe's claim to the Debtor's accounts receivable is superior to the Debtor or Sichel's claim. *Debtor's Mem. in Support of Cross-Motion for Relief from Stay*, ex. B. It appears that the lawsuit was set for trial in early September, 2004. *Aff. of Linda Sichel, sworn to on Nov. 26, 2004,* ¶ 7. On August 18, 2004, Roscoe filed an involuntary Chapter 7 petition against the Debtor. The Court granted the Order for Chapter 7 relief on September 24, 2004. Sichel, acting as the President of the Debtor, then filed an ex parte motion to convert the case from a chapter 7 to a chapter 11, which the Court granted by Order dated October 29, 2004.

## ARGUMENTS

Roscoe argues that Sichel, as the Debtor's sole officer, director, and shareholder, converted the case to a Chapter 11 because she wanted to continue to prosecute a lawsuit against

him. He contends that the Debtor has no reasonable expectation of rehabilitating itself. He asserts that Sichel's desire in prosecuting the State Court Action against him is not based on the best interests of the Debtor's creditors, but is instead based on her animus towards him. Sichel cannot be impartial in regard to the prosecution of the lawsuit, Roscoe contends, which means that she cannot fulfill her fiduciary duties as the President of the Debtor-in-Possession. Roscoe further argues that conversion is warranted because Code § 1112 states that the Court may convert a Chapter 11 to a Chapter 7 for cause when there is no likelihood of rehabilitation and there is a continuing diminution of the estate.

According to Roscoe, Sichel's prior malfeasance is an alternate reason for justifying the appointment of a Chapter 11 trustee under Code § 1104. Her attempts to ruin the Debtor, Roscoe alleges, shows that Sichel is not an appropriate person to run the Debtor and that she is not managing the Debtor with the best interests of the Debtor or its creditors in mind. Roscoe asserts that the Debtor's argument for having a chapter 11 liquidation plan instead of having a chapter 7 liquidation plan is based on its unsupported allegation that the administrative costs would be less under a chapter 11 than a chapter 7. This assertion is speculative at best, Roscoe contends, because of the work that will be required by an attorney and an accountant in formulating a chapter 11 plan and disclosure statement, which then must be approved by the Court.

The Debtor argues that the Court should neither reconvert the case to a chapter 7 nor appoint a chapter 11 trustee. According to the Debtor, Roscoe failed to produce any evidence that liquidation would proceed more expeditiously and less expensively in a chapter 7. The Debtor contends that whether the Debtor is "reorganizable" or not is not a ground for reconverting a chapter 11 to a chapter 7. The Debtor also argues that the appointment of a trustee in a chapter

10

11 case is an extraordinary remedy and that there is a strong presumption that the Debtor should be permitted to remain in possession absent a showing of need for the appointment of a trustee.

Sichel, in her individual capacity (not on behalf of the Debtor), argues that Roscoe views a trustee as a party that can provide a degree of insulation between Roscoe and the claims pending against him in the State Court Action. Even assuming the truth of the allegations of Sichel's misdeeds in connection with the operation of the Debtor, those allegations have no relevance, Sichel argues. They occurred before the petition filing date and are not capable of recurring as the Debtor no longer operates. According to Sichel, the administrative costs of proceeding in a chapter 11 and obtaining confirmation of a chapter 11 liquidation plan would be less than the administrative costs of proceeding by way of a chapter 7 liquidation case. Sichel also contends that although she is not overly fond of Roscoe, there is no per se rule that acrimony between a debtor's principals is the basis for the appointment of a trustee. She additionally submits that any recovery of the requested relief in the State Court Action would belong to the Debtor because her contention is that Roscoe inflicted damage on the Debtor, rather than on some independent and distinct interest of Sichel.

## DISCUSSION

Code § 1112(b) provides, in part, that on request of a party in interest, and after notice and a hearing, the court may dismiss or convert a chapter 11 case to a chapter 7 case, whichever is in the best interest of creditors and the estate, for cause. However, as this Court noted in *In re Dark Horse Tavern*, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1989), conversion or dismissal of a chapter

11

11 case is a drastic measure, and the burden is on the movant to prove the relief requested is warranted and not premature.

The process of determining whether a chapter 11 case should be either converted or dismissed involves a two-step analysis. *Rollex Corp. v. Associated Materials, Inc.* (*In re Superior Siding & Window, Inc.*), 14 F.3d 240, 242 (4th Cir. 1994). First, it must be determined that "cause" exists to dismiss the Chapter 11 proceeding or convert it to a Chapter 7. *Id*. "Cause" is enumerated in ten non-exclusive categories, and may also be established by the filing and maintaining of the Chapter 11 without good faith. *In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 817 (Bankr. N.D.N.Y. 1989), citing 11 U.S.C. § 112(b). Second, it must be determined which of the two options is in "the best interest of creditors and the estate." *Rollex Corp.*, 14 F.3d at 242. The Court has wide discretion in determining how to dispose of a case pursuant to a Code § 1112 motion.[3] *In re Dark Horse Tavern*, 189 B.R. at 581. Because relief under § 1112(b) is discretionary rather than mandatory, the Court may decline to convert or dismiss a case under § 1112(b), even in the presence of cause. The harshness of conversion or dismissal mandates that it result only after a strong evidentiary showing. *Id*. The party requesting relief bears the burden of proving that cause exists by a preponderance of the evidence. *In re Woodbrook Assocs.*, 19 F.3d 312, 316 (7th Cir. 1994); *In re Continental Holdings, Inc.*, 170 B.R. 919, 929 (Bankr. N.D. Ohio 1994).

---

[3] Though not applicable to his case, the Court notes that the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCA") significantly expands the grounds upon which a court may convert or dismiss a Chapter 11 case. *See BAPCA § 1112(b)(4)*. In addition, BAPCA § 1112(b)(1) seems to eliminate or significantly curtail the Court's discretion in granting conversion or dismissal of a Chapter 11 case, by utilizing the terms "shall convert...or dismiss a case" in place of the terms "may convert or may dismiss a case" in the prior law applicable to this contested matter.

Under Code § 1112(b)(1), a chapter 11 case may be converted or dismissed for "continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation." The first question is whether the bankruptcy estate is suffering some diminution in value. *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988). This element can be satisfied by proving that the debtor has incurred losses or maintained a negative cash flow position after the entry of the order for relief. *In re Schriock Constr., Inc.*, 167 B.R. 569, 575 (Bankr. D. N.D. 1994). There need not be a significant diminution in the estate to satisfy § 1112(b)(2). All that need be found is that the estate has suffered some diminution in value. *In re Kanterman*, 88 B.R. at 29.

Here, there is no doubt that the chapter 11 Debtor has no reasonable likelihood of rehabilitation. The Debtor has not operated since March of 2001, and Sichel has testified that she intends to file a liquidation plan on the Debtor's behalf. Rehabilitation within the meaning of § 1112(b)(1) means to put back in good condition and reestablish on a sound basis. *In re D & F Meat Corp.*, 68 B.R. 39, 41 (Bankr. S.D.N.Y. 1986) (citing *In re Wright Air Lines, Inc.*, 51 B.R. 96, 100 (Bankr. N.D. Ohio 1985)). Rehabilitation will not happen in this case, however. Roscoe has not made a strong evidentiary showing that there is a continuing loss to or diminution of the estate. According to the Debtor's Schedule A, the Debtor owns no real property. The Debtor's Schedule B provides that NYSEG, a public gas and electric utility, is holding a $2,000 security deposit for utility services, which belongs to the Debtor. Sichel possesses miscellaneous items of office furniture and equipment belonging to the Debtor. Schedule B further states that Roscoe is holding the Debtor's software for woodworking, with a listed fair market value of $68,475.30, and that Roscoe also possesses licenses of "Jobwrite" software of an unknown value. The

13

Debtor's last profit and loss statement, which was in February of 2005, lists no expenses. Since April 14, 2005, the Debtor's attorney has held approximately $94,900 in trust, which belongs to the bankruptcy estate.[4] Debtor's attorney stated in the evidentiary hearing that he would not charge the estate any attorney fees after July 7, 2005. The Court finds that Roscoe has not met his burden of proof of showing that the estate is diminishing. Additionally, the Court is not convinced that it is in the best interest of creditors and the estate to convert the case. Sichel asserts that she engaged in considerable discovery for the State Court Action during 2002. *Debtor's Mem. in Support of Cross-Motion for Relief from Stay*, p.2. It appears that it would take time for a chapter 7 trustee to understand the facts and allegations in the Action, and any further delay in the resolution of the Action would not benefit the creditors or the estate.

Roscoe also asserts that Sichel is violating her fiduciary duties as the president and sole officer and director of the Debtor-in-Possession. He cites to *In re Bowman*, 181 B.R. 836 (Bankr. D. Md. 1995), to provide support for his contention that Sichel's animosity towards him provides a basis for reconverting this case. In *Bowman*, a chapter 7 trustee filed a notice proposing to accept a settlement offer in a lawsuit that was the debtor's only asset. The trustee believed that the settlement offer was large enough to pay all of the estate's creditors and that the debtor's interests were appropriately balanced because the bankruptcy estate was going to pay her sizeable, nondischargeable tax claims. The debtor objected to the proposed acceptance as inadequate and

---

[4] On April 14, 2005, the Court ordered that James Salk shall turnover all funds held by him (1) as restitution from Charlene Foster in the approximate amount of $38,400, and (2) from the State of New York in the approximate amount of $35,000 to the Harris Law Office, PLLC, to be held in trust pending further Order of the Court. The Court additionally ordered Roscoe to turnover all funds held by him in which he asserts a security interest against the Debtor in the amount of $21,500 to the Harris Law Office, PLLC, to be held in trust pending further Order of the Court.

14

moved to convert the chapter 7 case to a chapter 11 case, stating that it was her intention, as debtor-in-possession, to proceed with the litigation through trial. *Id.* at 841. The key distinction between that case and the case before this Court is that in *Bowman* the debtor's risks were minimal in pursuing the litigation, while the creditors risked everything, at no added benefit, if the lawsuit continued. If the debtor continued the lawsuit, the creditors could have received less than what the settlement offered them, but they would never have received more than what they were owed. *Id.* at 844. If the debtor prevailed in the litigation, there was a potential to recover a larger sum of money for her, but if she lost the lawsuit, most of her debts were discharged. *Id*. In the case before this Court, the Debtor's Schedule F shows that Sichel holds an unsecured nonpriority claim of $150,500. Sichel also asserted at the evidentiary hearing that she was a guarantor of debt incurred by the Debtor. *See also Aff. of Linda Sichel, sworn to on Feb. 16, 2005,* ¶ 12. Roscoe did not dispute this assertion. Thus, there are many risks for Sichel in pursuing the State Court Action on the Debtor's behalf and, unlike *Bowman*, the interests of the Debtor and the creditors as to whether or not to pursue the litigation, are not irreconcilable.

At the same time, the Court understands that as the representative of the Debtor, Sichel must administer the State Court Action for the benefit of all creditors. *In re Kelso*, 196 B.R. 363, 371 (Bankr. N.D. Tex. 1991); *Bowman*, 181 B.R. at 843. Sichel has a fiduciary duty to those creditors, and the creditors' interests take precedence over those of the Debtor. *Id.* Sichel, therefore, bears a trustee's fiduciary duty to maximize the value of the bankruptcy estate. *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003). Given Sichel and Roscoe's past disputes, and that Sichel is both a creditor and a guarantor of at least some of the Debtor's debts, the Court finds that Sichel possesses the incentive to

15

maximize the Debtor's bankruptcy estate. However, the Court recognizes Roscoe's concerns that Sichel's anger toward him will prevent her from accepting any settlement offers made by him. At each future status conference, the Court can inquire as to the status of the State Court Action. If the Court were to find that Sichel was not administering the State Court Action for the benefit of all the creditors, it could reconsider either reconverting the case to a chapter 7 or appointing a chapter 11 trustee.

Roscoe also requests the appointment of a chapter 11 trustee as an alternative to reconverting the case to a chapter 7. The appointment of a trustee in a chapter 11 case is an extraordinary remedy. *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990). The party moving for the appointment of a trustee must prove the need for one under Code § 1104 by clear and convincing evidence. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989); *In re Madison Mgmt. Group, Inc.*, 137 B.R. 275, 281 (Bankr. N.D. Ill. 1992). If a court finds that the moving party has discharged this burden, it "shall" appoint a trustee under Code § 1104(a), but determining whether the moving party has satisfied its burden under either subsection of § 1104 is committed to the court's discretion. *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313, 318 (3d Cir. 2004). Absent fraud or some other compelling reason, it is preferable to have the chapter 11 debtor's current management operate the debtor's business, rather than to appoint a trustee. *In re Madison Mgmt. Group, Inc.*, 137 B.R. 275 (Bankr. N.D. Ill. 1992). Trustees are not the norm in chapter 11 cases because often a debtor's existing management will be more familiar with the company than a court-appointed trustee, and it would thus be better able to operate the debtor, while foregoing the expense of a trustee. *See Chinery*, 330 F.3d at 573; *In re Sharon Steel*, 871 F.2d at 1226.

Here, the Debtor plans to file a liquidation plan. As this Court noted in *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 987 (Bankr. N.D.N.Y. 1988) (citing Code §§ 1123(a)(5)(D), 1123(b)(4), 1129(a)(11)), while the primary purpose of chapter 11 is reorganization, liquidation is not prohibited. A debtor may choose to liquidate in a chapter 11 rather than in a chapter 7 case because the disposition of assets will be conducted in a less expensive, swifter and more orderly manner by a debtor-in-possession, as opposed to a trustee, who, while disinterested, is still a third party unfamiliar with the property of the estate. *Id.* at 986. Appointing a Chapter 11 trustee in this case would add needless expense when the Debtor is not operating and its main asset appears to be the State Court Action.

> Code § 1104(a) provides that:
>
> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee-
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
> (2) if such appointment is in the interests of the creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

Under Code § 1104(a)(1), pre-petition acts of misconduct, as well as post-petition acts of misconduct constitute cause for the appointment of a chapter 11 trustee. *See In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989). Roscoe alleges that Sichel committed numerous acts of gross misconduct in purposely trying to ruin the Debtor. Upon reviewing the testimony elicited at the evidentiary hearing, this Court concludes that both Roscoe

and Sichel bear significant blame for the Debtor's demise by thinking they could jointly run a company while their marriage was falling apart, even if they appointed a panel of three advisors to the Debtor. It appears that they both engaged in destructive conduct while operating the Debtor. However, the Court concludes that Roscoe did not prove by clear and convincing evidence, as he must, that there is cause for the appointment of a trustee under § 1104(a)(1). A policy of flexibility pervades the Bankruptcy Code with the ultimate aim of protecting creditors. *Committee of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239, 242 (4th Cir. 1987). Implicit in a finding of incompetence, dishonesty, etc., for purposes of § 1104(a)(1), is whether the conduct shown rises to a level sufficient to warrant the appointment of a trustee. *In re General Oil Distribs., Inc.*, 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984). Because one would expect to find some degree of incompetence or mismanagement in most businesses that have been forced to seek the protections of chapter 11, the Court must find something more aggravated than simple mismanagement in order to appoint a trustee. *Schuster v. Dragone,* 266 B.R. 268, 272 (D. Conn. 2001); *In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 644-45 (Bankr. E.D.N.Y. 1980). Therefore, the Court finds that Sichel's misconduct does not rise to a level that warrants a trustee's appointment. The Debtor is no longer operating, and Roscoe and Sichel no longer work together. The primary cause of the Debtor's problems has been eliminated.

Code § 1104(a)(2) is the alternative ground for appointing a trustee. It sets forth a flexible standard for appointment of a trustee even when no cause exists. *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994) In determining whether a trustee should be appointed under § 1104(a)(2), courts have examined factors such as the trustworthiness of the debtor, the debtor's past and present performance and prospects for rehabilitation, the confidence of the

business community in the debtor, the benefits to be derived from the appointment of a trustee, and whether the trustee could accomplish the goals of a Chapter 11 plan more efficiently and effectively than the debtor in possession. *Schuster*, 266 B.R. at 273; *In re Sanders*, No. 99 B 9876, 2000 WL 329574, at *5 (Bankr. N.D. Ill. Mar. 2, 2000). However, there is a strong presumption against appointing a trustee, *In re G-I Holdings, Inc.*, 385 F.3d at 319, and the Court again finds that Roscoe did not meet the required burden of proving by clear and convincing evidence that it is in the best interests of the creditors to appoint one. Here, the Debtor is no longer operating. The Debtor-in-Possession is already familiar with the State Court Action. The costs of appointing a trustee would reduce the amount of money available for distribution to creditors. Roscoe has not convinced the Court that the cost of appointing a trustee would be outweighed by the benefit of having one at this stage.

The bankruptcy court in *In re V. Savino Oil & Heating Co.*, 99 B.R. at 526, explained that "the willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor-in-possession defaults in this respect, Section 1104(a)(1) commands that the stewardship of the reorganization effort must be turned over to an independent trustee." Roscoe does not allege that Sichel is presently defaulting in her fiduciary duties, but instead alleges that Sichel "could not fulfill her fiduciary obligations in regard to the prosecution of the lawsuit against Jack Roscoe." *Roscoe Mem. of Law in Regard to Motion to Reconvert,* p.10. Using its discretion, this Court finds that it is possible for Sichel to fulfill those duties. Therefore, the Court will give Sichel an opportunity to actively prosecute the lawsuit as the representative of the Debtor. If she defaults in this respect, the Court will then consider reconverting the case to a

Chapter 7 or appointing a Chapter 11 trustee to manage the case, including the State Court Action.

Sichel is not pursuing the State Court Action in her personal capacity, but on the Debtor's behalf. She asserts that under New York law, a party damaged by a wrong committed in the management of a corporation may, in some circumstances, sue derivatively to recover on behalf of the corporation for the damage done to the corporation. *Mem. on behalf of Linda Sichel in Opposition to Motion by Jack Roscoe*, p.1. This Court will not decide whether Sichel has standing to pursue the State Court Action on the Debtor's behalf. That is for the state court to resolve. The Court stresses, however, that if the state court rules that Sichel does not have standing, this Court reserves the right to reconvert the case to a chapter 7 or appoint a chapter 11 trustee, so that a trustee can decide whether the Debtor should pursue any claims against Roscoe directly.

Finally, Sichel has asserted that recovery in the State Court Action would belong to the Debtor. *Id.* This Court holds that any recovery received in the State Court Action will in fact be property of the Debtor's estate to be distributed to the creditors. Based on the foregoing reasons, the Court denies Roscoe's motion to reconvert to a chapter 7 or appoint a chapter 11 trustee, without prejudice

To the extent that it is necessary to include the Debtor as a defendant in the State Court Action, the Court will grant the Debtor's cross-motion for relief from the automatic stay to permit Sichel to continue it on the Debtor's behalf. The Court would observe that normally such relief is unnecessary as long as the action is not seeking any recovery from the Debtor.

IT IS SO ORDERED.

20

Dated at Utica, New York

this 29th day of March 2006

                                                /s/    Hon. Stephen D. Gerling  
                                                STEPHEN D. GERLING  
                                                Chief U.S. Bankruptcy Judge